GRIFFIS, P.J., for the Court:
¶ 1. Jason Pruitt appeals the chancellor’s denial of his petition to modify custody. We affirm in part and reverse and remand in part for further proceedings consistent with this opinion.
FACTS
¶ 2. Jason and Lisa were married on March 22, 2003.
¶ 3. On March 26, 2010, Lisa and Jason were divorced by an agreed final judgment of divorce on the grounds of irreconcilable differences. The judgment gave Lisa physical custody of Cole, born October 18, 2003, and Kyle, born September 4, 2004. Jason was awarded visitation. The judgment gave Lisa and Jason joint legal custody of Cole and Kyle.
¶ 4. In April 2012, Jason filed a petition to modify custody. He alleged that there was a material change in circumstances that had occurred, and it adversely affected the children. Jason alleged that, under Lisa’s custody: (1) the children were exposed to illegal drug activity and persons of bad reputations, and (2) the children had poor school performance and attendance because of Lisa’s poor health.
¶ 5. A hearing on the petition was held on December 6, 2012. Lisa testified that she started dating Bobby Stafford in August 2010. Stafford had been indicted on felony charges for the sale of hydrocodone in the fall of 2010. Lisa testified that she dated Stafford for a year, and the relationship ended when he went to jail in 2011. Lisa also gave a synopsis of her recent medical history:
I’ve suffered from migraines for several years. It started out just regular headaches and started to progress from there. It became migraines with dizziness, and it affected my eyesight. It affected my hearing. They did diagnose me with pseudotumor cerebri, and as of February of this year, started with spinal taps, which led to now counting is [sic] four brain surgeries. Pseudotumor cerebri is not a tumor. It’s where your body thinks it’s a tumor, and your body doesn’t recycle spinal fluid like it should, so it just builds up pressure. So there is no drain between the two. They’s why the shunt has been put in to drain the pressure from my head.
¶ 6. Lisa also testified that, in February 2011, she had to go to Ochsner Hospital, in New Orleans, to see a team of neurosurgeons and neurologists due to her vision loss. She took the children with her, and they missed a week of school. While in New Orleans, Lisa took the children to two Mardi Gras parades, because she said that she wanted things to be as normal as possible for them. Lisa rode in a wheelchair at the parades.
¶ 7. Lisa testified that she was currently under the care of her doctors, and the doctors do not foresee the need for another medical procedure. Lisa denied any abuse of narcotics and pain killers. However, she does take prescribed pain killers and is on a pain management program. The doctor’s medical records listed overuse of pain medication as one of Lisa’s problems.
¶ 8. Barbara Williams, a social worker for the Department of Human Services, investigated Lisa and her home. Williams found that: the children’s basic needs were taken care of, there was no evidence of abuse, the home was a safe environment, Lisa had familial support, and there were no dangers at home. Williams testified that she never had any doubt that *1114 Lisa was a good mother. When asked about her investigation, Williams stated that there were some safety concerns because Lisa had a taser, and Jason had a pistol.
¶ 9. Cole testified that one year at Christmas, Jason told him that Cole needed to stop telling on Kyle. If he did not, Jason would hurt Lisa and her mother, Judy Sims, and take Cole to the hospital to watch them die. Cole further testified that Jason broke things in the house. After the divorce, Jason broke Cole’s bird’s neck. Cole testified that Jason threw him against a wall and screamed at him. Jason also spanked Cole with a shoe, a belt, and a spoon.
¶ 10. Jason testified that he received a letter from Sims dated February 10, 2012, and this letter was the main reason why he filed the petition for custody modification. In the letter, Sims stated that since Lisa started dating Stafford, she had taken care of the children almost ninety percent of the time. Sims wrote in the letter that Cole and Kyle see things that no child should ever have to see, including drug deals. At the time the letter was written, Lisa was working at night, so the boys would fall asleep at Sims’s house. Sims would take them to school. Sims stated that people would show up at Lisa’s house and pills disappeared. While Lisa was at work, Sims, Jason, or Jason’s parents had the children. Sims stated that Jason was a good father who loves his children. If you asked the children who they would want to live with, Kyle would say Jason or Jason’s father, Jay, and Cole would say Sims.[1] Sims turned Stafford in for selling drugs.
¶ 11. Jason testified that he saw Stafford alone with the children and that his private investigator videotaped it. When asked if he had the tape, Jason said that the tape was lost.
¶ 12. On December 20, 2012, the chancellor issued a final judgment and ruled that Lisa’s relationship with Stafford was not a “change in material circumstances that was serious enough to warrant a modification of custody.” The chancellor found that while Lisa’s health had deteriorated and this amounted to a material change in circumstances, it did not adversely affect the children. It is from this judgment that Jason appeals.
STANDARD OF REVIEW
¶ 13. “In domestic relations cases, [the appellate court’s] scope of review is limited by the substantial evidence/manifest error rule.” Samples v. Davis, 904 So.2d 1061, 1063-64 (¶ 9) (Miss.2004) (citing Jundoosing v. Jundoosing, 826 So.2d 85, 88 (¶ 10) (Miss.2002)). “[We] will not disturb the chancellor’s opinion when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.” Id. at 1064 (¶ 9) (quoting Holloman v. Holloman, 691 So.2d 897, 898 (Miss.1996)).
ANALYSIS

Custody Modification

¶ 14. “In the ordinary modification proceeding, the non-custodial party must prove: (1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this *1115 change adversely affects the child’s welfare; and (3) that the child’s best interests mandate a change of custody.” Denmark v. Denmark, 118 So.3d 679, 681 (¶ 5) (Miss.Ct.App.2013). “[T]he totality of the circumstances should be considered.” Id. “Even though under the totality of the circumstances a change has occurred, the court must separately and affirmatively determine that this change is one which adversely affects the children.” Id. “Furthermore, it is well settled that the polestar consideration in any child custody matter is the best interest and welfare of the child.” Id. (citing Albright v. Albright, 437 So.2d 1003,1005 (Miss.1983)).
¶ 15. Here, the chancellor found that: (1) Lisa’s relationship with Stafford was not a material change in circumstances, and (2) Lisa’s deteriorating health was a material change in circumstances but did not rise to a level of adverse effect.

A. Material Change in Circumstances

¶ 16. The chancellor must first decide whether there has been a material change in circumstances since the custody decree was issued.

i. Lisa’s Relationship with Stafford

¶ 17. Jason argues that the chancellor should have found Lisa’s relationship with Stafford was a material change in circumstances, which warranted custody modification.
¶ 18. The chancellor concluded that Lisa’s relationship with Stafford, “though not preferred, [was not] a sufficient change in material circumstances that [was] serious enough to warrant a modification of custody.” The chancellor ruled that most of Jason’s testimony about Stafford was based on Sims’s letter, which was written approximately six months after Stafford was incarcerated. The chancellor found that because Stafford was already incarcerated, there was no evidence of any other threat or exposure to illegal activity and persons with unseemly character.
¶ 19. In Ruth v. Burchfield, 23 So.3d 600, 602-03 (¶ 6) (Miss.Ct.App.2009), Ruth presented evidence that his daughter had witnessed inappropriate behavior between her fifteen-year-old babysitter and her twenty-year-old half brother. Testimony also showed that the half brother was using marijuana in the house. Id. at 604 (¶ 10). At the time of trial, Burchfield had fired the babysitter, and the half brother no longer lived in their home. Id. at 603 (¶ 6). This Court affirmed the chancellor’s judgment and found that the potential adverse conditions had been removed. Id. at 606-07 (¶ 20).
¶ 20. Jason asserts that the situation in Ruth is different from this case. Burch-field removed any potential adverse conditions, and Lisa did not. Here, Stafford’s incarceration removed the potential adverse effect on the children. By the time the hearing was held, there was no real danger or threat. Thus, we find that there was sufficient evidence to support the chancellor’s decision.
¶ 21. Jason also contends that Lisa’s new relationship with Tracey Jones will cause problems in the future. Jason claims that Jones is a convicted felon. Lisa testified at trial that Jones is a childhood friend who was hired as a handyman by her landlord. She has denied any romantic relationship with Jones. The chancellor found that there was little or no evidence to support the contention that Lisa had a romantic relationship with Jones and that Lisa is a “single woman entitled to her life.” There was sufficient evidence to support the chancellor’s decision.

ii. Lisa’s Health

¶ 22. The chancellor did find that Lisa’s health decline was a material *1116 change in circumstances. In his final judgment, the chancellor ruled:
The failure to supervise troubles the Court, as to the attendance of the children at school. Without a doubt, Lisa has had a hard time in the past year with her medical condition and this would account for the allegation that she has been unable to properly supervise the children. This failure centers on the school attendance of the children, Lisa’s prognosis for her illness and her need for a variety of medications in relation to her recovery. These issues do constitute a material change in circumstances which are serious enough to result in modification of custody.
It was proven that the boys had not attended school regularly, although they passed. They were also frequently late. There was little or no proof to show if the performance of the boys in school was affected by this, as neither one was portrayed as an exemplary student....
¶ 23. We agree with the chancellor that there was sufficient evidence of a material change in circumstances. Lisa’s health has deteriorated since the custody decree was entered. Because of this, Kyle and Cole have missed many days of school, they are regularly tardy for school, and their homework is often incomplete. Additionally, their grades are poor. Thus, we agree with the chancellor’s finding that Lisa’s health deterioration has caused a material change in circumstances in her home.

B. Adverse Effect

¶ 24. Once the chancellor has found that a material change in circumstances has occurred in the custodial home, he must determine whether that change has adversely affected the children. Denmark, 118 So.3d at 681 (¶ 6).
¶ 25. Here, the chancellor found that the material change in circumstances did not rise to a level of an adverse effect on the children. The chancellor concluded:
There is no debate that it is adverse to a child to not attend school regularly. Lisa’s illness affected this dramatically. However, Jason lives in Noxubee County and the children would have to be moved to another school. Also, he is too far away to make sure they are at school on time and regularly. Further, his work schedule ... requires him to leave early and come home late. He depends on his father as much as Lisa depends on her mother for this duty.
It is also without question that Lisa’s illness and associated medication use can cause her to be unable to properly supervise the children or to meaningfully engage with them in homework, school and extracurricular activities. However, there was no persuasive evidence that rose to the level necessary to allow this Court to change custody.
¶ 26. Jason argues that the chancellor abused his discretion when he found that Lisa’s change in health had no adverse effect on their children.
¶ 27. Two teachers from the children’s school, Pam Farrow and Pam Cobb, testified that the children’s homework appeared to be completed more after a night with Jason. Also, the children are at school more often if they stay with Jason. Farrow has taught both Cole and Kyle. She testified that Kyle seems to have fewer problems with homework completion than Cole. Farrow testified that she told Sims that she wanted the children to ride the school bus so they would not be tardy. Farrow further testified that Jay usually brings the children to school when they stay with him and Jason.
¶ 28. Cobb testified that Kyle seemed happier after spending the previous night *1117 with Jason and Jay. According to Cobb, Kyle wanted to live with Jason.
¶ 29. In Riley v. Doerner, 677 So.2d 740, 744 (Miss.1996), the supreme court held:
[Wjhere a child living in a custodial environment clearly adverse to the child’s best interest ] somehow appears to remain unscarred by his or her surroundings, the chancellor is not precluded from removing the child for placement in a healthier environment.... A child’s resilience and ability to cope with difficult circumstances should not serve to shackle the child to an unhealthy home, especially when a healthier one beckons.
Although the chancellor applied Riley to his findings, the chancellor concluded:
The facts of this case do not rise to a requisite showing of a strong likelihood or that necessary to find an adverse effect. It be would preferable to have the children in school regularly and on time. It would be preferable if Lisa had not undergone medical problems and [been] reliant on prescription medication. It would be preferable that Lisa choose more wisely in her associations. It appears to this Court that the problems asserted by Jason stem from Lisa’s unavoidable illness and the necessity under doctor’s care to use prescription medications.
This Court still must consider the effect on the children even though it does not appear that the current issues are voluntary. Neither boy was alleged to be a good student. Even though the attendance was not good, they both passed. The use of medication by Lisa was not shown to be adverse to the children....
¶ 30. We find that the chancellor was in error in the conclusion that Lisa’s health deterioration had no adverse effect on the children. The evidence indicated that the children almost failed their respective grades because of school absences. They received poor grades and often did not have their assignments completed. Also, they were frequently late and/or absent from school. In fact, they missed a week of school to accompany Lisa to her doctor’s appointment in New Orleans, and to attend Mardi Gras parades. Thus, we conclude that the chancellor’s decision that there was no adverse effect on the children was not supported by substantial evidence and was an abuse of discretion.
C. Albright Analysis
¶ 31. After a chancellor has found a material change in circumstances and an adverse effect on the children, the final step is to conduct a best-interest analysis, found in Albright.[2]
¶ 32. The Mississippi Supreme Court “has enumerated several factors to help chancellors determine what is in the ‘best interest’ of the child in a custody dispute.” Story v. Allen, 7 So.3d 295, 297 (¶ 13) (Miss.Ct.App.2008) (citing Albright, 437 So.2d at 1005). These include:
[A]ge, health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent[;] *1118 and other factors relevant to the parent-child relationship.

Id.

¶ 33. In conclusion, we affirm the chancellor’s decision that there was a material change in circumstances in the custodial home. We reverse the chancellor’s decision that there was no adverse effect on the children, and we remand this case for the chancellor to proceed with the Albright analysis.
¶ 34. THE JUDGMENT OF THE CHANCERY COURT OF LOWNDES COUNTY IS AFFIRMED IN PART AND REVERSED IN PART, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE APPELLANT AND THE APPELLEE.
LEE, C.J., IRVING, P.J., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR.

.. Sims testified at the hearing. When asked about the letter she wrote, she testified that parts of the letter were missing. Sims testified that she wrote the letter under coercion. She stated that Jason threatened her' — he told her that if she did not write the letter, he would tell everybody that he had sex with Sims and that he would take the children away, and they would never be found.

. Albright, 437 So.2d 1003.